DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from a summary judgment on a breach of settlement agreement and the subsequent determination of damages in the Lucas County Court of Common Pleas. For reasons that follow, we affirm.
 {¶ 2} During World War II, Willys-Overland Motors Company's Toledo assembly plant built hundreds of thousands of military Jeeps for the war effort. Following the war, the company continued to produce civilian Jeeps ("C-Js"). Until the end of the century, under various corporate owners, the plant continued to produce the brand. The Jeep is now a product of the DaimlerChrysler Corporation.
 {¶ 3} In the mid 1970's, appellant Gregory Roe began a business specializing in selling Jeep parts to collectors and restorers. Roe incorporated this business as Willys-Overland Motors, Inc., the other appellant herein.
 {¶ 4} In 1997, Roe negotiated the sale of the assets of the business to appellee W.O.M., Ltd. The transaction was memorialized in an installment purchase agreement wherein appellee agreed to pay appellants two percent of the gross profit against a $25,000 purchase price for fixed assets. This payment was to continue after payment for the fixed assets for an additional 60 months as payment for good will. Additionally, appellee was to pay to appellants ten percent of the "adjusted profit" for two years and 15 percent for an additional three years or until the amount of $300,000 had been paid. Appellants' inventory was to remain in their hands and be sold on consignment and billed to appellee at appellants' cost when sold. The agreement also provided for a mutual noncompete covenant. A separate property lease on a portion of appellants' business location completed the deal.
 {¶ 5} The business relationship between the parties did not go well. On February 25, 2000, appellee sued appellants, alleging, inter alia, that appellants misrepresented the content of the available inventory and the legitimacy of the use of the trade name "Willys-Overland" which appellee asserted was a federally registered trademark belonging to DaimlerChrysler.
 {¶ 6} Prior to appellants' response to appellee's complaint, the parties agreed to submit the case to dispute resolution. The parties retained retired Judge Richard McQuade to act as mediator.
 {¶ 7} On June 8, 2000, Judge McQuade conducted a mediation at the offices of appellants' then counsel. All parties were present and represented by counsel. At the end of this session, Judge McQuade outlined the conclusions of the meeting in a handwritten document captioned "settlement." Item one in this document was "purchase price $187,500 10% down;" item two: "term 5 years;" item 3: "interest 9 1/2% fixed;" item four: "security agreement OK (by Jay [Margolies appellee's president]." Item six stated "all assets of Willys-Overland Company `Jeep business.'" Item seven stated "cooperation of [appellants] in defense of trademarks, tradenames, assign same to [appellee] or designee." The remainder of the document dealt with removal of the parts from appellants' property, nonperformance penalties, ownership of the proceeds of an insurance claim on a forklift, and tax consequences. The document was signed by counsel for both parties.
 {¶ 8} On June 4, 2000, appellants' counsel sent appellee's counsel a draft "asset purchase agreement." Accompanying this was a cover letter requesting that appellee's counsel prepare "the trademark assignment and the residual noncompete agreement." Appellants' counsel volunteered to prepare the other schedules, "* * * except for the list of assets, which I am sure we will have to coordinate with our respective clients in order to get a proper listing."
 {¶ 9} In a later filed affidavit, appellee's counsel averred that after receipt of this letter, he unsuccessfully attempted to schedule a time to compile a list of assets to be incorporated into the asset purchase agreement. Eventually, appellee's counsel wrote appellants' counsel, advising him that due to appellants' refusal to cooperate, appellee would consent to no more extensions in the underlying litigation. According to appellee's counsel, he received no formal reply from appellants' counsel, but was advised by telephone that appellants had acquired new counsel.
 {¶ 10} On September 7, 2000, new counsel entered an appearance on behalf of appellants. According to the affidavit from appellee's counsel, shortly thereafter, he expressly inquired of new counsel as to whether appellants intended to honor the settlement agreement. New counsel responded, according to the affidavit, that appellants did not intend to go forward with the settlement. On September 21, 2000, appellants answered the original complaint, denying appellee's allegations and interposing counterclaims of breach of the original installment purchase agreement, breach of the lease, fraud and conversion. Appellee responded with a motion for summary judgment, enforcing the settlement and dismissing appellants' counterclaims. Appellants opposed the motion.
 {¶ 11} After some delay, the trial court concluded that there was no genuine question of material fact concerning the evidence submitted, that the parties had reached a settlement and that appellants had breached the settlement. Further, the court concluded, the underlying prior agreements in the suit had been merged into the settlement, extinguishing appellants' counterclaims. The matter then proceeded to a bench trial on damages and appellee's motion for attorney fees and expenses. The court eventually entered judgment for appellee in the amount of $202,000 in damages resulting from the breach, $80,000 for prejudgment interest, $97,152 in attorney fees, $29,716 for expert fees and $3,035.70 for costs and expenses.
 {¶ 12} From this judgment, appellants now bring this appeal, setting forth the following six assignments of error:
 {¶ 13} "1. The Trial Court erred in finding that the parties reached a binding settlement agreement without first conducting an evidentiary hearing to resolve disputed questions of fact.
 {¶ 14} "2. Assuming arguendo that the Trial Court properly found the existence of a binding settlement agreement, the Trial Court erred in holding that Defendants breached the purported agreement, as Defendants had substantially performed the obligations thereunder, and Plaintiff had not.
 {¶ 15} "3. The Trial Court's award of lost profits damages for the alleged breach of the settlement agreement is invalid because Plaintiff failed to mitigate and minimize its purported losses.
 {¶ 16} "4. The Trial Court's award of lost profit-damages for alleged breach of the settlement agreement is against the manifest weight of the evidence, is not supported by non-speculative, certain evidence, and constitutes an abuse of discretion.
 {¶ 17} "5. The Trial Court erred as a matter of law and fact in awarding Plaintiff attorneys fees, other litigation expenses and prejudgment interest.
 {¶ 18} "6. The Trial Court erred as a matter of law and fact in awarding judgment against Defendant Gregory Roe, personally."
 I. The Settlement Agreement {¶ 19} In their first assignment of error, appellants assert that the trial court erred in finding a binding settlement without a hearing. Citing Rulli v. Fan Company, 79 Ohio St.3d 374, 1997-Ohio-380, syllabus, appellants insist that when the terms or existence of a settlement agreement is at issue, a court is obligated to conduct an evidentiary hearing before enforcing the agreement.
 {¶ 20} The present matter is distinguished from Rulli procedurally.Rulli was before the trial court on a factual question of the existence of a settlement agreement. This matter arose in the context of a motion for summary judgment. A grant of summary judgment is precluded if there is any genuine issue of a material fact. Civ. R. 56; Harless v. WillisDay Warehousing Co. (1978), 54 Ohio St.2d 64, 67. Findings of fact demand an evidentiary hearing. On a motion for summary judgment, if a factual finding is required, the motion must be denied.
 {¶ 21} In a summary judgment proceeding, the party advancing the motion must specifically delineate the basis upon which the motion is brought, Mitseff v. Wheeler (1988), 38 Ohio St.3d 112, syllabus, and identify those portions of the record that demonstrate the absence of a genuine issue of material fact. A "material" fact is one which would affect the outcome of the suit under the applicable substantive law.Russell v. Interim Personnel, Inc. (1999), 135 Ohio App.3d 301, 304;Needham v. Provident Bank (1996), 110 Ohio App.3d 817, 826, citingAnderson v. Liberty Lobby, Inc. (1986), 477 U.S. 242, 248. Both parties must support their positions with evidentiary material which conform to Civ. R. 56(E).
 {¶ 22} In practice, a proponent of a motion for summary judgment will submit his or her motion and memorandum in support with affidavits and supporting documents representing what the party asserts are the undisputed facts. If the materials sufficiently support the proponents' position, the opponent must come forward with supporting documents which demonstrate that there is a genuine issue of material fact. Id.;Riley v. Montgomery (1984), 11 Ohio St.3d 75, 79. If the facts are undisputed, the court must determine whether they entitle the movant to judgment as a matter of law. Civ. R. 56(C). Appellate courts employ the same standard. Lorain Natl. Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129.
 {¶ 23} Here, appellee moved for summary judgment, asserting that there was a settlement agreement and that appellants had breached it. In support, appellee submitted the affidavit of the mediator, Judge McQuade, who averred that, after prolonged negotiations, the parties reached an agreement, that the principals of all parties, "* * * acknowledged that they understood the terms of the agreement and accepted and agreed to it. In my opinion, the case was settled." Attached to the mediator's affidavit was a copy of the terms of the agreement as written by him and signed by counsel for both parties.
 {¶ 24} Appellants' response dwells at length on events preceding the mediation and after the mediation, but contains nothing which would directly contest the affidavit of the mediator in a material way. Appellant Gregory Roe's affidavit states that the "settlement" failed to include his unwillingness to settle unless he prevailed on an insurance claim, but fails to suggest that this reservation was ever mentioned during the mediation. Appellant Roe also avers that he did not, nor was he asked to sign the settlement documents, but does not contradict the mediator's averment that appellant Roe's counsel signed with Roe's agreement and acceptance.
 {¶ 25} On these presentments, we must concur with the trial court that there exists no material question of fact as to whether the "settlement" document reflected the negotiated agreement of the parties. Accordingly, no hearing on this matter was required. Appellants' first assignment of error is not well-taken.
 II. Breach {¶ 26} In their second assignment of error, appellants maintain that the trial court erred in finding a breach of the settlement agreement. Appellants insist that they substantially performed their obligations under the agreement while appellee did not.
 {¶ 27} Citing Doner v. Snapp (1994), 98 Ohio App.3d 597, 600, appellants delineate the elements necessary to prevail in a breach of contract claim as 1) existence of a contract, 2) performance by plaintiff, 3) breach by defendant, and 4) damages. Appellants argue that appellee made no showing that it tendered performance or substantially performed that which was required of it under the settlement: specifically, appellee never tendered the ten percent down payment per the settlement document. Moreover, appellants insist, they did substantially perform when they turned over equipment and customer lists of the Jeep business pursuant to the original installment purchase agreement.
 {¶ 28} With respect to appellants' performance, the trial court properly found that any residual issues from the original installment purchase agreement, "* * * merged in the settlement and are thereby extinguished." As a result, any partial performance by appellants under the original agreement holds no relevance with respect to the settlement agreement.
 {¶ 29} Concerning a requirement that appellee tender performance to show breach, we first observe that the issue in the Doner case was damages, not performance. Moreover, appellants omit the Doner caveat that the elements enumerated there, "[generally, * * * must be present * * *" to prove a breach. As appellee has repeatedly pointed out, no tender of performance is required when an anticipatory repudiation of the contract occurs. See DeMuesy v. Haimbaugh (Dec. 31, 1991), 10th Dist. No. 91AP-212; 2 Restatement of the Law 2d, Contracts (1989), 286, Section 253(2).
 {¶ 30} An anticipatory breach of a contract occurs when there is a repudiation of the promisor's duty under the contract prior to the time fixed for performance. Daniel E. Terreri Sons v. Bd. Of Mahoning Cty.Commrs., 152 Ohio App.3d 95, 105, 2003-Ohio-1227, ¶ 44. An anticipatory repudiation occurs when a party declares he or she will not perform the terms of the contract. Id. at 106, 2003-Ohio-1227, ¶ 46; 2 Restatement, supra, at 272, Section 250(A). When an anticipatory repudiation occurs, the nonbreaching party may treat the repudiation as a breach and may immediately seek remedy. Farmers Comm. v. Burks (1998),130 Ohio App.3d 158, 172; 23 Lord, Williston on Contracts (2003), 559, Section 63:33. Here, the affidavit of appellee's counsel, averring that only a few weeks after the mediation appellants' counsel informed him that appellants, "* * * had no intention of going forward with the settlement agreement" is unrefuted. A fair reading of this statement is that appellants declared their intention not to perform the terms of the settlement agreement. Consequently, the trial court did not err in declaring a breach of the settlement agreement as a matter of law. Accordingly, appellants' second assignment of error is not well-taken.
 III. Damages {¶ 31} In their third and fourth assignments of error, appellants assert that the trial court's damage award was erroneous because the court failed to hold appellee to its duty to mitigate losses and/or because the evidence of damage was speculative and against the manifest weight of the evidence.
 {¶ 32} As with any breach of contract, the nonbreaching party has a duty to mitigate his or her damages. Farmers Comm. Co., supra, at 173; 3 Restatement of Law 2d Contracts (1981), 126, Section 350. Except when reasonable efforts to avoid loss are unsuccessful, "* * * damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation." Id.
 {¶ 33} In this matter, according to appellants, appellee failed to mitigate his loss because it elected to seek damages rather than specific performance and because it rejected appellants' offer after the breach to convey the disputed inventory for the agreed purchase price.
 {¶ 34} When an anticipatory repudiation of a contract has occurred, the nonbreaching party may elect to resort to any remedy available for the breach. The option belongs to the aggrieved party. The breaching party has no say. South Main Akron v. Lynn Realty (1951), 62 Ohio Law Abs. 103, 107; 13 Lord, Williston on Contracts (4th Ed. 2000), 666, Section 39:37; 2 Restatement of the Law 2d, Contracts (1981), 286, Section 253. Thus, if appellants' only assertion is that appellee failed to mitigate damages by seeking monetary damages, that position is without support in law.
 {¶ 35} The same is true of the purported offer to convey the auto parts at issue for the purchase price. Clearly, appellee has elected to treat appellants' repudiation as a total breach of the contract. Having made that election, it is under no obligation to revive any portion of the contract.
 {¶ 36} Additionally, as will be discussed in the next section, a substantial portion of the value of this agreement resided in the fact that the parts at issue were genuine original Jeep parts, not easily replaced, if replaceable at all. To mitigate damages for the loss of genuine original Jeep parts, it would seem incumbent on appellants to at least allege that replacement parts were available in the market place. Appellants have not done this. Accordingly, appellants' third assignment of error is not well-taken.
 {¶ 37} Appellants also maintain that the measure of lost profits damages awarded by the court, is speculative and, therefore, against the manifest weight of the evidence.
 {¶ 38} Lost profits may be recovered as damages from a breach of contract if 1) such profits were within the contemplation of the parties, 2) lost profits were the probable result of the breach, and 3) profits are not remote or speculative, but may be shown with reasonable certainty. Charles R. Combs Trucking Co. v. International Harvester,Inc. (1984), 12 Ohio St.3d 241, paragraph two of the syllabus.
 {¶ 39} To establish the value of the lost profits resulting from appellee's breach of the settlement agreement, appellee employed the services of Garth M. Tebay, a principal in Tebay Mosley Associates. Tebay is a certified public accountant and certified valuation analyst.
 {¶ 40} Beginning with the 1997 inventory of consignment parts that appellants provided to appellee, the expert tracked sales of each part from the date of the parties' original agreement until appellee vacated appellants' premises in 2000. With adjustments, Tebay used this data to determine a per part inventory level for when the settlement agreement fell apart. The valuator also used appellee's sales data to determine the growth rate established for the period appellee operated the business. He then applied the growth rate on a part by part basis to estimate lost sales and lost profits from the date the suit was initiated until the damages trial. Adjusting for expenses of which appellee was relieved and discounting the result to present value at the time of the settlement agreement, Tebay testified at trial that appellee's lost profits resulting from the breach amounted to $202,000.
 {¶ 41} Tebay testified, and the trial court expressly found, that the methodology utilized was in conformity with accepted standards of valuation. Indeed, it is not the methodology of the expert that appellants attack. Rather, appellants maintain, the underlying inventory and cost figures were too speculative.
 {¶ 42} After the mediation, appellants blocked appellee's access to the automotive parts at issue. To establish a baseline inventory, the valuation expert worked from a 1997 inventory appellants had provided to appellee. From this inventory, he deducted part sales by appellee. In several instances, the valuator found sales of parts that were listed as zero in the original inventory. The expert testified that, when this occurred, he would consult with appellee's employees and adjust the inventory in accordance with their recollections of what actually existed. On cross examination, the expert conceded that in a few instances, the adjusted inventory count was erroneous, but denied that the variation would have a significant effect on the result. On appeal, appellee characterizes these few errors as, "* * * too minor given that there were a total of 652 different parts in the inventory, 45,131 separate units.
 {¶ 43} Appellee's characterization obtains some resonance from Tebay's report that approximately 70 percent of the lost profits reported came from a single item: a CJ-7 "tub." The CJ-7 tub is actually a welded assembly of more than a dozen parts that form the body of a now discontinued model of Jeep. One of the components of the tub is a side panel with the raised word "Jeep" stamped in the middle.[1] The expert's inventory showed parts to make 100 CJ-7 tubs at a projected sale price of $3,500 per tub.
 {¶ 44} At trial, appellant Roe testified that there were not enough parts to make even one tub. Appellee's president, Jay Margolies, however, testified that a tub constructed with original Jeep side panels could be sold as an original tub even though the other parts used were not original. According to Margolies, there were sufficient side panels in inventory to produce 100 tubs. This testimony is uncontradicted. Indeed, appellants offered no valuation testimony or alternative inventory count, even though the parts at issue were in appellants' possession.
 {¶ 45} Appellants also challenged the cost figure that the expert attributed to the CJ-7 tub for parts purchased from other suppliers to build the tubs. The $500 cost used by the expert in his report was too low, according to appellants, thus increasing the loss from the sale attributable to appellants. A more realistic figure, appellants insisted was $841.61 per unit. Tebay conceded the point and recomputed his figures using an outside supplier cost of $804.61.[2] This recomputation resulted in the $202,000 damage figure the trial court found.
 {¶ 46} Appellants also complain that the projected $3,500 sales cost for a CJ-7 tub was too speculative, given the historic data for CJ-7 tub sales recorded no sale at as much as that price. According to appellants, in fact, the data shows the price of tubs declining.
 {¶ 47} On redirect examination, appellee's valuation expert testified that he accounted for the lower price of two tubs sold after a high price purchase of $3,300, as being the result of the later sales having been made up of tubs composed entirely of nonoriginal part components. Reasonably, the expert opined, these less desirable units commanded a lower price. The expert stood by his projection that, had appellee been able to sell tubs made with appellants' original equipment parts, a price of $3,500 per unit was reasonable.
 {¶ 48} To recover lost profits, the existence and amount of such profits must be shown with reasonable certainty. Gahanna v. EastgateProperties, Inc. (1988), 36 Ohio St.3d 65, syllabus. Reasonable certainty of lost profits may be demonstrated by expert testimony, economic and financial data, marketing surveys and analysis and business records. AGF, Inc. v. Great Lakes Heat Treating Co. (1990),51 Ohio St.3d 177, 183. Since the evidence submitted in this matter is of the nature expressly approved, we cannot say that the trial court erred in accepting that evidence as proving lost profits with reasonable certainty. As regards the underlying data, that is a question of sufficiency of the evidence. Judgment supported by some competent, credible evidence will not be disturbed on appeal as against the manifest weight of the evidence. C.E. Morris v. Foley Constr. Co.
(1978), 54 Ohio St.2d 279, syllabus. In this matter, there is a substantial body of competent, credible evidence to support the award of lost profits. Accordingly, appellants' fourth assignment of error is not well-taken.
 IV. Attorney Fees, Expenses and Interest {¶ 49} In their fifth assignment of error, appellants insist that appellee was not entitled to prejudgment interest or attorney fees.
 {¶ 50} R.C. 1343.03(A) provides, in material part:
 {¶ 51} "(A) [W]hen money becomes due and payable * * * upon any settlement * * * the creditor is entitled to interest at the rate per annum determined pursuant to section 5703.47 of the Revised Code, unless a written contract provides a different rate of interest * * *."
 {¶ 52} Appellants direct our attention to the statutory phrase "money [that] becomes due and payable" which, they argue, forecloses the imposition of interest in this case because, under the settlement agreement, no money was due to appellee from appellants, only parts. In support of this proposition, appellants cite RPM, Inc. v. OatleyCo., 9th Dist. No. C.A. 3282-M, 2005-Ohio-1280.
 {¶ 53} Appellee responds, maintaining that the purpose of prejudgment interest is to make the aggrieved party whole and that in furtherance of this purpose, Ohio courts have long awarded prejudgment interest as part of compensatory damages.
 {¶ 54} In RPM, a manufacturer obtained a confidentiality agreement from a competitor who sought to inspect the manufacturer's books and facilities, ostensibly for purposes of evaluating the company for acquisition. No acquisition occurred and, when it appeared the defendant had breached the confidentiality agreement, RPM sued and won a verdict for breach of contract. The defendant appealed, inter alia, the trial court's award of prejudgment interest on the breach award. The defendant argued prejudgment interest was not permitted because the damages awarded did not constitute money, "* * * `due and payable' under a contract." RPM, ¶ 62.
 {¶ 55} The court of appeals agreed with defendant, concluding that, "[t]he contract at issue provided that RPM would disclose to Oatey information * * * and, in return, Oatey would keep that information confidential * * *. Had both parties fully performed under the agreement, no money would have been exchanged by these parties. Id., ¶ 69. Consequently, the appeals court concluded, there was "no money due and payable" and R.C. 1343.03(A) did not apply. Id.
 {¶ 56} Irrespective of our view of the correctness of RPM, it is distinguishable from the present matter. Here, there was an intention to exchange money for something of value. Thus, with a breach of the agreement, the nonbreaching party was deprived of something of value and the dollar amount of that value was ascertainable. The purpose of prejudgment interest is to, "* * * make the aggrieved party whole."Royal Elec. Constr. v. OSU (1995), 73 Ohio St.3d 110, 117. "'At the moment the cause of action accrued, the injured party was entitled to be left whole and became entitled to be made whole. * * * All damages then, whether liquidated or unliquidated, pecuniary or nonpecuniary, should carry interest from the time the cause of action accrues * * *.'" Id., quoting with approval State v. Phillips (Alaska 1970), 470 P.2d 266,274.
 {¶ 57} When appellants repudiated the settlement agreement on June 30, 2000, appellee was denied the benefit of his bargain. Thus, to be made whole, he was entitled to statutory interest on the value of the loss incurred from the loss of that benefit. This is what the trial court awarded. We find no error in this action.
 {¶ 58} With respect to the legal fees awarded, ordinarily attorney fees are not recoverable in a contract action. Exceptions to this general rule, however, exist. An award of attorney fees is permitted 1) if a statute creates a duty to pay such fees, 2) the nonprevailing party acts in bad faith, or 3) the parties contract to shift fees. Shanker v.Columbus Warehouse Ltd. (June 6, 2000), 10th Dist. No. 99AP-772, citingMcConnell v. Hunt Sports Ent. (1999), 132 Ohio App.3d 657, 699. Additionally, legal fees may be recovered as compensatory damages in certain circumstances. Id.
 {¶ 59} In the present matter, appellee argued in the trial court that it was entitled to attorney fees both as compensatory damages and a result of appellee's bad faith and wrongful conduct. The trial court found that appellee, "* * * made the requisite showing to recover attorney fees, out of pocket litigation expense, and expert witness fees as additional compensatory damages under each of the theories if posited." After an exhaustive review of the record, we cannot say that the trial court erred in this conclusion. Accordingly, appellants' fifth assignment of error is not well-taken.
 IV. Personal Judgment {¶ 60} In his remaining assignment of error, appellant Roe asserts that the trial court erred in making its judgment applicable to him as an individual as opposed to his corporate entity.
 {¶ 61} As appellee properly notes, Gregory Roe was an individual signatory to the original 1997 installment contract. He was individually named a defendant in this lawsuit and never asserted his corporate shield. He also individually asserted counterclaims in this suit. Appellee further notes that the draft settlement agreement prepared by appellants' attorney contained a signature line for Roe in his individual capacity.
 {¶ 62} Ordinarily errors that are not brought to the attention of the court by objection or otherwise are waived and may not be raised on appeal. Stores Realty Co. v. Cleveland (1975), 41 Ohio St.2d 41, 43. Appellant Roe had ample opportunity to raise and prove his right to corporate protection in the proceeding below, but did not. As a result, he cannot now be heard to say that the court erred on a matter it was never asked to consider. Accordingly, appellants' sixth assignment of error is not well-taken.
 {¶ 63} On consideration whereof, the judgment of the Lucas County Court of Common Pleas is affirmed. Appellants are ordered to pay the costs of this appeal pursuant to App. R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Lucas County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App. R. 27. See, also, 6th Dist. Loc. App. R. 4.
[1] The testimony was that the stamp on the panel actually spells "joop" but reads "Jeep" when a decal is applied.
[2] Appellants derive this figure from an on stand evaluation by Tebay of the most recent costs of component parts. An apparent miscalculation resulted in an erroneous total of $841.61, rather than the correct sum of $804.61.